AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

JUN 1 4 2010

CHRIS R. JOHNSON, CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>505 NORTH SHADY AVENUE, NUMBER 2,<br>FAYETTEVILLE, ARKANSAS 72701 | )<br>)<br>)<br>)<br>)<br>)   Case No.  *FA 10-36* |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A.

located in the _____Western_____ District of _____Arkansas_____ , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code,<br>Sections 371, 1029, 1030,<br>1343, and 1349 | Conspiracy (371), access device fraud (1029), computer intrusion (1030), wire<br>fraud (1343), and conspiracy to commit wire fraud (1349) |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Christian Schorle, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  6/14/10   2:50 p.m.        _____
*Judge's signature*

City and state:  Fayetteville, Arkansas       Honorable Erin L. Setser, U.S. Magistrate
*Printed name and title*



U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

JUN 1 4 2010

CHRIS R. JOHNSON, CLERK

BY

DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS

IN RE SEARCH OF THE PREMISES          :     **TO BE FILED UNDER SEAL**
LOCATED AT 505 NORTH SHADY AVENUE,    :
NUMBER 2, FAYETTEVILLE, ARKANSAS      :     Hon. Erin L. Setser
72701                                 :
                                      :     Mag. No. *FA 10-36*
                                      :
                                      :     <u>AFFIDAVIT</u>

STATE OF ARKANSAS           )
                            )    ss.
COUNTY OF WASHINGTON        )

Christian Schorle, being duly sworn, deposes and says:

      1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and

have been so employed for approximately 26 months. My experience as an FBI agent has

included the investigation of cases involving the use of computers and the Internet to commit

violations of fraud, intrusion, and intellectual property laws. I have received training and have

gained experience in interview and interrogation techniques, arrest procedures, search warrant

applications, the execution of searches and seizures, computer crimes, intellectual property and

other computer-based crimes, computer evidence identification, computer evidence seizure and

processing, and various other criminal laws and procedures. I have personally participated in the

execution of search warrants involving the search and seizure of computer equipment and

computer-related crimes.

      2.     The information contained in this affidavit is based upon my personal

knowledge and observation, my training and experience, conversations with other law

enforcement officers and witnesses, and the review of documents and records. I submit this

affidavit in support of an application for a warrant to search the home of Andrew Alan Escher

Auernheimer, a/k/a "Weev," a/k/a "Weevlos," a/k/a "iProphet," located at 505 North Shady Avenue, Number 2, Fayetteville, Arkansas 72701 (hereinafter, "the SUBJECT PREMISES"), for all documents and things listed on Attachment B hereto, including, but not limited to, any computer equipment and data storage devices.  The SUBJECT PREMISES is more particularly described in Attachment A hereto.

       3.     Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to search the SUBJECT PREMISES.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

       4.     Based upon the facts set forth herein, I respectfully submit that there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 371, 1029, 1030, 1343, and 1349 (hereinafter, the "Specified Federal Offenses"), are located at the SUBJECT PREMISES.

## PROBABLE CAUSE

### A. The iPad and AT&T

       5.     The iPad, introduced to the market on or about January 27, 2010, is a device developed and marketed by Apple Computer, Inc.  It is a touch-screen tablet computer, roughly the size of a magazine.  The iPad allows users to, among other things, access the Internet, send and receive electronic mail, view photographs and videos, read electronic books, word-process, and create spreadsheets and charts.  For some iPad models, Internet connectivity is provided strictly over Wi-Fi, while others offer a combination of Wi-Fi and AT&T's 3G wireless

network.[1]

6.      AT&T offers two data plans for iPad 3G users: 250 MB of data per month for $14.99 and 2 GB of data per month for $25.  iPad 3G users who wish to subscribe to the AT&T 3G network must first register with AT&T.  During the registration process, the user is required to provide, among other things, an e-mail address, billing address, and password.  At the time of registration, the user's e-mail address is automatically linked to the Integrated Circuit Card Identifier ("ICC-ID") of the customer's iPad, which is a 19 to 20 digit number unique to every iPad.  By linking each user's e-mail address with a unique ICC-ID, AT&T is able to automatically recognize the user each time he accesses AT&T's website, thereby providing the user with both faster and more user-friendly access to the AT&T website.

**B. The Data Breach**

7.      As originally configured, when iPad 3Gs communicated with AT&T's website, the ICC-ID of each iPad 3G was displayed in the Universal Resource Locator, or "URL," of the AT&T website in plain text.[2]

8.      Between on or about June 3, 2010 and on or about June 8, 2010, a "script" termed "the iPad 3G Account Slurper" (the "Account Slurper") was deployed against AT&T's servers.  The Account Slurper was designed to mimic the behavior of an iPad 3G so that AT&T servers targeted by the Account Slurper would falsely believe that the servers were communicating with an actual iPad 3G.

---

[1] Both Wi-Fi and the 3G wireless network are mechanisms by which users can access the Internet.

[2] Auernheimer and others have since described this display of information in the URL as a "hole," or weakness, in AT&T's security system.

9.      The Account Slurper utilized a practice known as a "brute force" attack, which is an iterative process used to obtain information from a computer system.  Here, the Account Slurper cycled through different ICC-IDs until it hit upon genuine ICC-IDs, which were then used to steal the iPad 3G user e-mails addresses corresponding to those stolen ICC-IDs.

10.     Once deployed, the Account Slurper randomly guessed at ICC-IDs.  An incorrect guess by the Account Slurper was met with no additional information, while a correct guess revealed and made available to the authors of the Account Slurper a genuine ICC-ID and the e-mail address associated with it for a specific, identifiable iPad 3G user.  Ultimately, the authors of the Account Slurper were able to steal e-mail addresses and associated ICC-IDs for at least approximately 114,000 iPad 3G customers.  This was done without the authorization of AT&T, Apple, or any of the individual iPad 3G users.

11.     On or about June 9, 2010, following the theft of the approximately 114,000 e-mail addresses and ICC-IDs, the authors of the Account Slurper provided the stolen e-mail addresses and corresponding ICC-IDs to the website, http://gawker.com.  Gawker is a website that advertises itself as providing "Gossip from Manhattan and the Beltway to Hollywood and the Valley."  Gawker proceeded to publish on its website the stolen information, albeit in redacted form, as well as an article concerning the breach (the "Gawker Article").

12.     Immediately after publication of the Gawker Article, AT&T initiated its own internal investigation of the breach and associated theft of the e-mail addresses and ICC-IDs.  Although that investigation is not yet complete, preliminary results reveal that the breach began on or about Thursday, June 3, 2010 and continued through on or about Tuesday, June 8, 2010.

-4-

### C. Auernheimer Claims Credit for the Breach

13.     Under the heading, "Breach details: Who did it, and how," the Gawker Article reported: "The [AT&T] subscriber data was obtained by a group calling itself Goatse Security." The Article continued:

> The group wrote a PHP script to automate the harvesting of data. Since a member of the group tells us the script was shared with third-parties prior to AT&T closing the security hole, it's not known exactly whose hands the exploit fell into and what those people did with the names they obtained. A member tells us it's likely that many accounts beyond the 114,000 have been compromised.

14.     On or about June 9, 2010, at approximately 4:18 p.m., a post was made to the LiveJournal weblog, http://weev.livejournal.com.[3] The "User" of this weblog is listed as "weev," and the "Name" associated with the weblog is "Escher Auernheimer." Auernheimer posted a weblog entry that day which stated: "Oh hey, my security consulting group just found a privacy breach at AT&T" (the "June 9 LiveJournal Post"). The June 9 LiveJournal Post further linked to the Gawker Article. The June 9 LiveJournal Post went on to state: "This story has been broken for 15 minutes, twitter is blowing the fuck up, we are on the forntpage [sic] of google news and we are on drudge report (the big headline)."

15.     Following the Gawker Article, news of the data breach was widely reported both in print media and on various Internet websites. On or about June 10, 2010, the website CNET published an article titled, "Hacker defends going public with AT&T's iPad data breach (Q&A)" (the "CNET Article"). The CNET Article reported: "On Thursday, CNET talked to a key member of Goatse – Escher Auernheimer, also known as 'Weev' – about the group and

---

[3] LiveJournal is a social networking website on which users can set up personal weblogs and post messages. Once a weblog has been created, only the user of that weblog can post messages and content on that weblog.

what motivates them."  In the article, a question and answer dialog was presented, including the following:

> Q:     So, one of your members had an iPad and noticed this strange interaction
>
>        with the AT&T Web site?
>
> A:     Auernheimer: He used this AT&T security maintenance app.  It was part
>
>        of the normal user experience that tipped him off to something that would
>
>        allow him to scrape this data.
>
> Q:     Then a script was written to do an automated brute force, right?
>
> A:     Auernheimer: Correct.

16.     On or about June 11, 2010, it was reported on the Internet and elsewhere that the FBI was looking into the AT&T data breach.

17.     Thereafter, Auernheimer began to distance himself from comments made in the CNET Article.  Specifically, Auernheimer participated in an interview with the *San Francisco Weekly*, which interview was posted on "The Snitch," one of that publication's blogs (the "Snitch Interview").  In the Snitch Interview, Auernheimer stated that Goatse: "did this [intrusion] as 'niceguy' as we could.  [The Wall Street Journal] wrote an article that implies pretty strongly that we are criminals.  We did not publically release the dataset, we waited until we confirmed the system was secured before we went public with technical details.[4]  I hope they don't try to get charges pressed[,] but if charges are pressed we will fight it and win."  Later in the Snitch Interview, and notwithstanding comments to the contrary earlier in that interview,

---

[4] Auernheimer's statement is false.  As noted in the Gawker Article and elsewhere, the breach was made public before AT&T had an opportunity to secure the system.

Auernheimer attempted to divorce himself from the breach altogether, stating: "I did not do it. I am just a publication agent." He also stated that "I'm just like a PR agent in this scenario," because the intrusion "wasn't my find." Rather, Auernheimer said: "I'm an artist, a real one – I don't hang my work on some gallery wall for douchebags to gawk at. Our motivation is to make art and to provoke human thought and to advance the human condition. Uninterested in lawbreaking, [we] want to make more art. Don't need to break [the] law to make art."

18.     During the course of their investigation, law enforcement officers contacted AT&T, which, as noted above, is conducting its own internal investigation of the breach and associated theft of the e-mail addresses and ICC-IDs. AT&T provided law enforcement officers with two e-mails that were forwarded from the original recipients to AT&T (i.e., the e-mails were not sent directly to AT&T). The first, dated on or about June 6, 2010 at approximately 6:50 p.m. Central Standard Time, was directed to Arthur Siskind, the former General Counsel of News Corporation and a current member of News Corporation's Board of Directors. The e-mail, from "Andrew A," with the e-mail address gluttony@gmail.com, read in relevant part: "An information leak on AT&T's network allows severe privacy violations to iPad 3G users. Your iPad's unique network identifier was pulled straight out of AT&T's database." "Andrew A" then provided Mr. Siskind with Mr. Siskind's ICC-ID and wrote: "We have collected many such identifiers for members of the media and major tech companies . . . ." The e-mail continued: "If a journalist in your organization would like to discuss this particular issue with us[,] I would be absolutely happy to describe the method of theft in more detail."

19.     The second e-mail was again sent from "Andrew A," with e-mail address gluttony@gmail.com, but this time to various executives at Thomson Reuters. The e-mail, sent

on or about June 6, 2010 at approximately 9:14 p.m. Central Standard Time, read, much like the first: "An information leak on AT&T's network allows severe privacy violations to iPad 3G users.  Your iPad's unique network identifiers were pulled straight out of AT&T's database." "Andrew A" then provided the Thomson Reuters employees with their individual ICC-IDs and wrote: "All these Thomson Reuters employees were revealed in a short data harvest by my working group[,] along with hundreds of thousands of other iPad 3G customers.  If anyone in your organization would like to discuss this particular issue for publication[,] I would be absolutely happy to describe the method of theft in more detail."

20.     Both e-mails were sent several days before the Gawker Article and, more importantly, at a time when, according to AT&T's internal investigation, the breach was still ongoing.  Through a review of previous FBI reports of investigation, specifically a report dated on or about October 14, 2009 from the Los Angeles Field Office documenting an FBI interview of Mark and Catherine Auernheimer, the parents of Auernheimer, law enforcement officers confirmed that the e-mail address gluttony@gmail.com is that of Auernheimer.  Specifically, during the October 14, 2009 interview, Mrs. Auernheimer told law enforcement officers that she communicates with Auernheimer through his e-mail address, gluttony@gmail.com.

21.     Moreover, the gluttony@gmail.com e-mail address is associated with Auernheimer's YouTube page.  YouTube is a website that permits users to create and post videos, and also permits users to create and maintain individual user "pages," which can include their individual videos and personal information.  Auernheimer maintains a YouTube page, with the user name "weevlos."  This page includes several videos attributed to Goatse Security. Auernheimer's photograph is posted on his "weevlos" YouTube page, and the page includes the

following statement: "If you enjoy my sermons please spread the word, and consider donating a

small sum via paypal to gluttony@gmail.com to help support evangelistic efforts."

  22. Accordingly, law enforcement officers believe that, based on the two e-

mails described in paragraphs 18 and 19, as well as the June 9 LiveJournal Post and the CNET

Article, Auernheimer was, at the very least, involved with the data breach and theft of the e-mail

addresses and ICC-IDs.  As noted above, his subsequent disavowals in the Snitch Interview are

not credible and appear to be an attempt to distance himself from the crime, particularly since, at

the time of the Snitch Interview, it was well known through print and Internet media that federal

law enforcement officers were investigating the breach.

**D. Auernheimer and Goatse Security**

  23. According to the Goatse Security website, Auernheimer, also referred to as

"weev," is a "Goatse Security Member."  Other members of Goatse are identified as: sloth,

Rucas, Sam Hocevar, Jmax, g0udatron[gapp], GaSSy Stinkiez, JacksonBrown, and g0sp-hell,

esq.  Goatse's website states that Goatse is a wholly-owned subsidiary of an entity called the

"GNAA."   In turn, Auernheimer is listed as the president of the GNAA.  According to the

GNAA's website, "GNAA" stands for the "Gay Nigger Association of America."  The GNAA's

website states that "[t]his website is maintained by the GNAA, world-famous trolling

organization."

  24. Since at least in or about April 2001, Auernheimer has been known to the

FBI as a computer hacker and self-proclaimed Internet "troll."  A troll is a person who

intentionally, and without authorization, disrupts services and content on the Internet.  According

to an August 3, 2008 article in *The New York Times* (the "New York Times Article"),

Auernheimer defined trolling as "basically Internet eugenics."

25.     Auernheimer has been very public concerning his hacking and trolling activities, giving interviews to *The New York Times*, as well as other publications.  These interviews provide probable cause to believe that Auernheimer was not working for the public interest, as he claimed in the Snitch Interview.

a.     In an interview for the New York Times Article, Auernheimer stated: "I hack, I ruin, I make piles of money," and continued: "I make people afraid for their lives."  He further stated that: "I want everyone off the Internet."  Indeed, Auernheimer said, bloggers – those who create content for online "weblogs," or "blogs" – "are filth.  They need to be destroyed.  Blogging gives the illusion of participation to a bunch of retards. . . .  We need to put these people in the oven!"  According to the New York Times Article, Auernheimer further stated: "The question we have to answer is: How do we kill four of the world's six billion people in the most just way possible?"

b.     The New York Times Article also noted that in 2007, Auernheimer delivered a lecture at a hacker convention in San Diego entitled "Internet Crime."

c.     In his interview for the New York Times Article, Auernheimer described how he "trolled" a blogger named Kathy Sierra.  Among other things, Auernheimer unearthed, and posted on the Internet, Sierra's real Social Security number and address.  Auernheimer also stated in the New York Times Article that he had access to hundreds of thousands of Social Security numbers, and sent to the author of the New York Times Article the author's own Social Security number.

d.     On or about August 8, 2008, Auernheimer participated in an

interview with the online magazine *Corrupt* (the "Corrupt Interview"). In the introduction to the

Corrupt Interview, Auernheimer was described as "a professional hacker and a troll veteran,

causing havoc at marketplaces and provoking reactions in the cyber world."

    e.    In the Corrupt Interview, Auernheimer stated that: "I have never

picked a troll target that was not morally and spiritually bankrupt." He also stated that: "[f]or the

companies I've targetted [sic], I've showed up at their parties and given some friendly greetings

to bask in the looks of disgust and disdain. I take credit and responsibility for my actions."

    f.    Auernheimer also stated in the Corrupt Interview that: "Security is

a myth, there is no system that cannot be broken."

    g.    Auernheimer provided some rationales for his actions during the

course of the Corrupt Interview: "Martin Luther contended in his tract 'On the Jews and Their

Lies' that if Moses were alive today[,] he'd be busy burning synagogues. I'm inclined to agree;

the only thing keeping us deriding furries on the Internet instead of going to their furry

conventions and rapidly exterminating them is the Jewish influence upon society."[5] In sum,

Auernheimer stated: "For Western values to survive, those who attack them must be

exterminated. We should start with the furries, and move to the media moguls who are glorifying

prostitution and drug use." As noted above, in perpetrating the data breach, Auernheimer and

others deliberately targeted "members of the media."

    26.    Auernheimer also maintains a webpage at www.blip.tv, which is a website

---

    [5] In his references to "furries," Auernheimer is apparently referring to an Internet
subculture of science fiction and fantasy enthusiasts who focus on cartoon animals,
anthropomorphic animals, or human-animal hybrids.

that, like YouTube, allows users to create and post videos.  On his blip.tv page, Auernheimer has

posted several "sermons" in the guise of the "iProphet."  One such video is entitled "Sermon on

Fear and The Men In Black/Direct Democracy."  During this video, Auernheimer states that:

"trolling can frequently have large economic repercussions as, as I learned, I learned when I

trolled Amazon; I saw a one billion dollar change in their market capitalization.  That's the most

monetary affection [sic] of a publicly traded stock that I've ever personally done.  I mean, I've

caused a more dramatic shift in price, but never market capitalization."  Auernheimer continued:

"so a billion dollars changed hands as a result of my trolling, and I'm very very glad to know that

such insignificant things on the Internet can have such drastic, far reaching effects."

Auernheimer concluded this section of his "sermon" with the following exhortation to fellow

trolls: "Of all these people out there that sometimes, I know there's a lot of trolls out there and

some of you get demotivated [sic], but what you do matters, what you're doing is right and good

and don't let anybody tell you it doesn't have a significant effect, because I know that it does."

### E. The Breach and the Connection to the SUBJECT PREMISES

27.     On or about March 4, 2010, Auernheimer was arrested at the SUBJECT

PREMISES by the Fayetteville Police Department for outstanding traffic warrants and

obstructing government operations.  *Agents with the FBI are aware the subject has resided in Fayetteville since Sept. 2009, and has resided at current location since early March of 2010.*

28.     On or about June 13, 2010, and June 14, 2010, law enforcement officers

conducted surveillance at the SUBJECT PREMISES.  Parked in the driveway of the SUBJECT

PREMISES both days was a Chevrolet Avalanche automobile with California license plate

number 8U80599.  Based upon records checks, this automobile is registered to Auernheimer.

29.     Law enforcement officers believe that Auernheimer participated in,

communicated with, and/or conspired with others regarding the data breach from the SUBJECT

PREMISES because in the CNET Article, Auernheimer stated in response to the question, "Are

you based in the U.S.?": "[Goatse Security isn't] based anywhere.  We work out of our homes[,]

and there are a couple of people in Texas.  There are a couple of people in LA, one guy in France,

and the rest are sort of scattered."  From my training and experience investigating computer

hackers who conduct their activities as part of a group, such hackers often maintain

communication with one another regarding their crimes as those crimes are being committed.

Such communications include, but are not limited to, internet "chats," e-mails, and other types of

documents and records that demonstrate awareness of the criminal activity before the results of

the activity are made public.  As Auernheimer stated that he and his Goatse Security cohorts

"work out of our homes," it is likely that evidence relating to the types of communications

referred to above, as well as additional evidence of the Specified Federal Offenses, will be

present at the SUBJECT PREMISES.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

30.    Based on my training and experience, and on conversations that I have had

with other law enforcement officers, I am familiar with the practices and methods of persons who

commit and attempt to commit the Specified Federal Offenses, and their necessary reliance on

computer technology to do so.  Such individuals often create and maintain records relating to

their criminal conduct, including, but not limited to, correspondence and memos, receipts,

telephone records, notes and personal documents, computer scripts, and the names of victims and

co-conspirators, on electronic databases on computers, stored in electronic or magnetic form.

Furthermore, users of computer equipment often create and maintain records of computer

ownership and subscriptions to Internet services.  Based on this information, and on the facts set

forth above, there is probable cause to believe that computer-related equipment that may contain

evidence of the Specified Federal Offenses described above may be found at the SUBJECT

PREMISES.

        31.    Based on my knowledge, training, and experience, I know that computer

files or remnants of such files can be recovered months or even years after they have been

downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files downloaded to

a hard drive can be stored for years at little or no cost.  Even when such files have been deleted,

they can be recovered months or years later using readily-available forensics tools.  When a

person "deletes" a file on a home computer, the data contained in the file does not actually

disappear; rather, that data remains on the hard drive until it is overwritten by new data.

Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space –

that is, in space on the hard drive that is not allocated to an active file or that is unused after a file

has been allocated to a set block of storage space – for long periods of time before they are

overwritten.  In addition, a computer's operating system may also keep a record of deleted data in

a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are

automatically downloaded into a temporary Internet directory or "cache."  The browser typically

maintains a fixed amount of hard drive space devoted to these files, and the files are only

overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to

retrieve residue of an electronic file from a hard drive depends less on when the file was

downloaded or viewed than on a particular user's operating system, storage capacity, and

computer habits.

-14-

32.    Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.    Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.    The volume of data stored on many computer systems and storage

-15-

devices will typically be so large that it will be highly impractical to search for data during the

execution of the physical search of the premises. A single megabyte of storage space is the

equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000

megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of

storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently,

each non-networked, desktop computer found during a search can easily contain the equivalent of

250 million pages of data, which, if printed out, would result in a stack of paper over ten miles

high. Further, a 500 GB drive could contain as many as approximately 250 full run movies or

450,000 songs.

        d.     Computer users can attempt to conceal data within computer

equipment and storage devices through a number of methods, including the use of innocuous or

misleading filenames and extensions. For example, files with the extension ".jpg" often are

image files; however, a user can easily change the extension to ".txt" to conceal the image and

make it appear that the file contains text. Computer users can also attempt to conceal data by

using encryption, which means that a password or device, such as a "dongle" or "keycard," is

necessary to decrypt the data into readable form. In addition, computer users can conceal data

within another seemingly unrelated and innocuous file in a process called "steganography." For

example, by using steganography, a computer user can conceal text in an image file which cannot

be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to

extract and sort through data that is concealed or encrypted to determine whether it is evidence,

contraband, or instrumentalities of a crime.

        33.     In light of these concerns, I hereby request the Court's permission to seize,

-16-

copy, image, and search the computer hardware (and associated peripherals) that are believed to

contain some or all of the evidence described in this warrant, and to conduct an off-site search of

the image or hardware for the evidence described.

## ITEMS TO BE SEIZED

34.     This Affiant requests authorization to search the SUBJECT PREMISES

for the items described in Attachment B.  Due to the claims made by Auernheimer that his

hacking was in the public interest, the Affiant seeks permission to search for and seize evidence

relating to the data breach, as well as evidence relating to Auernheimer's state of mind, such as

modus operandi, pattern, and absence of mistake.  Specifically, and as set forth in Attachment B,

for each of the categories listed below, the Affiant seeks authorization to search and seize

evidence pertaining to the data breach, the Specified Federal Offenses, and the state of mind of

Auernheimer and his confederates in committing the Specified Federal Offenses:

a.     All documents, notes, or other information concerning or related to

the Account Slurper, including, but not limited to, the Account Slurper itself.

b.     All electronic mail sent to or received by gluttony@gmail.com

concerning or related to the Account Slurper, iPads, AT&T, ICC-IDs, and victims of the data

breach.

c.     From January 27, 2010 through the present, all correspondence

with and posts to the website http://gawker.com.

d.     From January 27, 2010 through the present, all correspondence

with and posts to the website LiveJournal.

e.     All documents concerning or related to Goatse Security.

f.      All communications between members of Goatse Security, including those members listed on the Goatse Security website: Auernheimer, sloth, Rucas, Sam Hocevar, Jmax, g0udatron[gapp], GaSSy Stinkiez, JacksonBrown, and g0sp-hell, esq.

g.      All documents concerning or related to the GNAA.

h.      All documents concerning or related to Kathy Sierra, the trolling of Amazon, and "the organization."

i.      All documents concerning or related to trolling and hacking generally and records in whatever form that demonstrate that Auernheimer intentionally committed the Specified Federal Offenses.

j.      Records, in whatever form, of personal and business activities relating to the operation and ownership of the computer systems, such as telephone records, notes, books, diaries, and reference materials.

k.      Records, in whatever form, pertaining to accounts held with Internet Service Providers or of Internet use.

l.      As used above, the terms records, notes, documents, communications, correspondence, information, programs, applications or materials include records, notes, documents, communications, correspondence, information, programs, applications or materials created, modified or stored in any form, including electronic media.

m.      In order to search for the items described above that may be maintained in electronic media, law enforcement personnel seek authorization to seize, copy, image, and search the following items for off site review:

i.      Any computer equipment and storage device capable of

-18-

being used to commit, further, or store evidence of the Specified Federal Offenses;

      ii.    Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

      iii.    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

      iv.    Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

      v.    Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

      vi.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

      vii.    Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data; and

      viii.    Files, records, programs, logs, electronic communications, scanning programs, financial records, hacking software, and router configuration software.

## **CONCLUSION**

35.     Based on the above information, there is probable cause to believe that the Specified Federal Offenses, which, among other things, make it a federal crime to intentionally access a computer without authorization and thereby obtain information from that computer, have been committed and that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; or property designed for use, intended for use, or used in committing a crime, as described in Attachment B, are located at the SUBJECT PREMISES.  This Affiant requests authority to seize and search such material.

36.     Based upon the foregoing, this Affiant respectfully requests that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

37.     It is further respectfully requested that this Court seal, until further order of this Court, all papers submitted in support of this Application, including the Application, Affidavit, and Search Warrant, and the requisite inventory notice (with the exception of one copy of the warrant and the inventory notice that will be left at the SUBJECT PREMISES).  Sealing is necessary because the items and information to be seized are relevant to an ongoing investigation, and premature disclosure of the contents of this Affidavit and related

documents may have a negative impact on this continuing investigation and may jeopardize its

effectiveness.

_Christ J Schorl_
Christian Schorle, Special Agent
Federal Bureau of Investigation

Subscribed and sworn before me
14th day of June, 2010

_Erin L. Setser_
HONORABLE ERIN L. SETSER
United States Magistrate Judge

-21-